UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

UNITED STATES OF AMERICA,

v.                                    Criminal Action No. 2:15-00136

EMILE DAJUAN MARTIN,

## MEMORANDUM OPINION AND ORDER

Pending is defendant Emile Dajuan Martin's motion to suppress, filed October 15, 2015.

On October 28 and 29, 2015, the court held an evidentiary hearing attended by counsel for the parties and defendant Martin.  At the defendant's request, the court ordered supplemental briefing to commence following the filing of the hearing transcript.  The parties have completed submission of supplemental briefs, and the matter is now submitted for decision.  The court enters its findings of fact by a preponderance of the evidence and the conclusions of law that follow.

## I.   Findings of Fact

On Tuesday, January 12, 2015 at approximately 3:00 a.m., Sergeant Roger D. Rhodes of the Jackson County Sheriff's

Department was merging onto southbound Interstate 77 in Silverton, West Virginia when he observed a silver Pontiac Grand Prix with Michigan plates traveling in the same direction.  The Grand Prix crossed into the merge lane, forcing Rhodes to brake and pull over to avoid a collision.  As the Grand Prix continued ahead of him, Rhodes saw the vehicle weave back and forth, crossing the centerline six to eight times.

Based on these observations, Sergeant Rhodes was concerned that the driver of the Grand Prix was either falling asleep or intoxicated.  Rhodes was on duty but was driving his personal vehicle rather than a police cruiser and therefore could not effect a traffic stop.  He followed the Grand Prix and contacted a nearby subordinate, Deputy Brandon Williams, with a description of the vehicle and instructions to initiate a traffic stop near the Ripley exit.

Deputy Williams arrived in his cruiser and stopped the Grand Prix by 3:04 a.m.  His cruiser was immediately behind the Grand Prix.  Sgt. Rhodes pulled in behind the cruiser.  Deputy Williams reported his arrival to Jackson County 911 at 3:04 a.m. at which time he also reported the Michigan plate on the Grand Prix as "AG1601" which, at 3:11 a.m., he would correct to "AGJ601."  At 3:11 a.m. he also reported Montgomery's driver's license number.

Deputy Williams exited his cruiser and went to the side of the driver's door of the Grand Prix with Sgt. Rhodes behind him.  Deputy Williams asked Montgomery, the driver, for his driver's license, registration card and proof of insurance. Montgomery produced his driver's license and in "a very few seconds," retrieved the title to the Grand Prix from the glove box, stating he had no proof of insurance.  When Sgt. Rhodes stated that he thought Montgomery may have been falling asleep while driving, Montgomery replied that he had been up for quite a while and may have been sleepy.

Deputy Williams then directed Montgomery to exit the vehicle, which he did, and they talked about Montgomery's lack of a registration card and proof of insurance.  Montgomery stated that he had received the title to the vehicle from the previous owner, Antwon Smith, but had not changed the title into his own name.  Deputy Williams asked Montgomery about his travel plans and he explained that he was on his way to North Carolina and was expecting to drop off his passenger, the defendant Emile Martin, in West Virginia, while on his way south.  Deputy Williams next asked Montgomery whether he had anything illegal in the car.  Montgomery answered that he did not.  Deputy Williams then asked if he could search the car to which Montgomery responded that he could do so if he had probable

3

cause.  Deputy Williams interpreted this as a refusal to
consent.  He told Montgomery that he was issuing him citations
for crossing the center line and failure to show proof of
registration and insurance, and directed him to return to the
Grand Prix.

Deputy Williams then spoke to Deputy Saltsgaver who
had arrived shortly after the stop and who had proceeded to the
passenger side of the stopped vehicle where he spoke to the
defendant Martin.  Deputy Saltsgaver relayed his conversation
with the defendant.  Deputy Williams thought the stories the two
men gave did not match, but he has failed to state the nature of
the inconsistency.

Deputy Williams promptly reported to Sgt. Rhodes, in a
conversation that lasted two to three minutes, that the stories
of the two men did not match, that they were nervous, that
Montgomery had declined to consent to a search and that Deputy
Williams thought there was more than just a traffic violation.
At that point Sgt. Rhodes directed Deputy Williams to write the
citations.  Sgt. Rhodes then used his cell phone at about 3:11
a.m. to contact Lt. Roberts, the canine handler, to bring his
dog, Dul, to perform a canine search around the exterior of the
Grand Prix.  Although Deputy Williams does not specifically say
that he knew Sgt. Rhodes was making that call, he does

acknowledge that he had an indication that a drug dog was coming and "knew for sure" when he heard Lt. Roberts log on the radio at 3:30 a.m. that he was en route.

Deputy Williams returned to his vehicle to prepare the citations after first checking, as noted above at 3:11 a.m., the validity of the driver's license and the Michigan plate. After waiting for information relating to those items, which confirmed the validity of the driver's license and the registration of the Grand Prix in the name of Antwon Smith, he inquired as to whether there were outstanding warrants on Montgomery and, he says, possibly the defendant Martin as well. There were none. Deputy Williams states that he was not ready to proceed to write the citations until 3:21 a.m., by which time he had received a response to his warrants request.

There was, however, no need for Deputy Williams to delay preparation of the citations. He knew from the outset that, as reported by Sgt. Rhodes, Montgomery was weaving the Grand Prix back and forth across the center line on I-77 South and had thereby committed the offense that Deputy Williams deemed to be driving left of center. Shortly after the stop, Deputy Williams asked Montgomery for his driver's license, registration card and proof of insurance and received only the

driver's license, but neither a registration card nor proof of insurance.

Deputy Williams was thus immediately cognizant of the other two violations, namely, no registration card and no proof of insurance.  Instead of a registration card, Montgomery did hand over a Michigan title to the Grand Prix in the name of Antwon Smith whose signature as seller appeared on the block of the title entitled "Title Assignment by Seller" wherein the place for the name of the buyer or assignee was left blank.

When Sgt. Rhodes contacted Lt. Roberts at his home to come to the scene with Dul, Lt. Rhodes was in bed.  It was necessary that Lt. Roberts get dressed and, along with Dul, travel a circuitous route in order to get to the scene where he arrived at 3:33 a.m.  Once present, Lt. Roberts indicated it was three or four minutes before the search began.  By the time Dul circled the vehicle and alerted by jumping up and scratching the rear bumper, it would have been at least 3:37 a.m.  At that point, Deputy Williams was in the process of writing up the last of the three citations.  He immediately interrupted that task in order to participate in the search.  It was Deputy Williams who was searching the back seat of the Grand Prix where he found the heroin that is the subject of the offense charged in this case.

Deputy Williams did not complete the write up of the citations until he was back at headquarters.

The printed form on which the citations were set forth allowed for as many as two citations on the same form so that it was necessary for Deputy Williams to complete two single-page forms.  Both forms called for identical information taken from Montgomery's driver's license and the title to the Grand Prix, together with the date and hour and the deputy's signature. Hence, the second form was a duplicate of the first except for the fact that the first form set forth (1) the left of center citation as being in violation of West Virginia Code § 17C-7-6 and (2) no proof of registration in violation of West Virginia Code § 17A-3-13, whereas the second form was devoted to the charge of no proof of insurance per West Virginia Code § 17D-2A-4.

Deputy Williams was relatively new in his position as deputy sheriff with no prior law enforcement experience.  He had been hired on April 14, 2014.  He then spent sixteen weeks in an educational and training program at the state police academy followed by twelve weeks in field training.  He had been working on his own as a deputy sheriff for one and one-half months at the time of the January 12, 2015, incident in this case.

During that one and one-half month period he had, on five occasions, written up citations.  In addition, while at the academy and in the field training program, he had had some experience, but "not very much," in the write up of citations. He testified at the preliminary state hearing in this matter that it took him seven or eight minutes to write up a citation. He testified at the hearing on the motion to suppress in this case, that it instead required him nine to ten minutes, at which time he also said that the length of time required would be the same for each form, whether it contained two citations or only one.

Because Deputy Williams was still rather new to the task, it was necessary for him to consult a pocket list that he carried with him of state traffic charges and the West Virginia Code section of which each such charge was a violation in order to set forth the appropriate information on the form.  The court finds that it would have required Deputy Williams, in the cramped quarters of a cruiser, as long as ten minutes to fill out the first form with the two citations and seven minutes to complete the second form which, as noted, would have contained identical information in every respect as that already required on the first form except that the second form would have listed the charge, as it did, as "No Proof Insurance In violation of

<u>17D-2A-4</u> WV State Code" (underlining indicates filled-in blanks).  Of course, Deputy Williams would have spent less than seventeen minutes writing up the citations in his cruiser inasmuch as he did not complete that task until he returned to headquarters.

The court finds that Deputy Williams unnecessarily stalled the write up of the citations for the ten minutes elapsing from 3:11 a.m. to the point he says he began the write up at 3:21 a.m.  As noted, he had in hand all the information he needed to start the write up at 3:11 a.m. when so directed by Sgt. Rhodes.  Indeed, had he not allowed his attention to be diverted by his mere suspicions, he could have commenced that process several minutes earlier.

After conducting the search of the vehicle and finding the heroin, the officers arrested Montgomery and Martin and transported them to the Jackson County Sheriff's office.  Martin was interviewed by Detective Ross Mellinger beginning at 5:40 a.m.  Detective Mellinger advised Martin of his rights and read him a standard statement of rights for arrestees.  Mellinger asked Martin to initial beside each numbered right and to sign his name at the bottom of the form.  Before doing so, Martin asked if he had to initial each line and Mellinger replied "beside each number . . . basically that doesn't mean anything

other than just that you acknowledge that I read those to you and you understand them."  Martin initialed each enumerated right.

In addition, Martin signed his name under a paragraph marked "Waiver of Rights," which states the following:

> I have read the above statement of my rights and I understand each of these rights, and having these rights in mind I waive them and willingly make a statement.  I further waive my right to be taken before a Magistrate immediately until I have completed my statement.  No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.  I have been informed that I am under arrest and the nature of the charge against me.

Martin indicated that he had completed the tenth grade on a line asking for his educational background and wrote "yes" in response to a question asking if he can read and write and understood what he had read.  Mellinger asked him again if he had read and understood the entire form and if he had any questions, to which Martin replied he did not.

After waiving his <u>Miranda</u> rights, Martin admitted that he was transporting heroin to Charleston and planned to sell the drugs there.  He described prior trips that he and Montgomery had taken to the Charleston area from Detroit for the purpose of selling heroin.  Jackson County Sheriff's Department officers at that point called in officers from Ripley and Charleston to conduct further interviews.

On July 1, 2015, Martin was indicted on one count of possession with intent to distribute 100 grams or more of heroin in violation of 12 U.S.C. § 841(a)(1).  In the instant motion, Martin moves to suppress evidence against him on three grounds: 1) that the traffic stop of the Grand Prix, having been unreasonably prolonged by the officers, resulted in an unconstitutional seizure in violation of his Fourth Amendment rights, 2) that Dul, the narcotics dog, was insufficiently reliable for his alert on the Grand Prix to support probable cause to conduct a search, and 3) that he did not knowingly and voluntarily waive his rights prior to making his statement to Detective Mellinger.  The court addresses each of these arguments below.

## II.   Legal Standards

The Fourth Amendment states "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  When an officer observes a traffic violation, he is justified in conducting a stop to investigate that violation and to attend to related safety concerns.  Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015).  Such a stop constitutes a seizure under the Fourth

Amendment, and must be reasonably limited in scope and duration. See United States v. Digiovanni, 650 F.3d 498, 506-07 (4th Cir. 2011).

Courts have long acknowledged that "[t]he maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision." U.S. v. Branch, 537 F.3d 328, 336 (4th Cir. 2008).  Until recently, Fourth Circuit precedent dictated that de minimis delays in conducting a traffic stop, such as those occasioned by brief questioning on topics unrelated to the stop, do not violate an individual's Fourth Amendment rights.  See United States v. Mason, 628 F.3d 123, 131-33 (4th Cir. 2010); see also United States v. Digiovanni, 650 F.3d 498, 509-10 (4th Cir. 2011) (elaborating on the de minimis exception but declining to apply it because the officer "failed to diligently pursue the purposes of the stop and embarked on a sustained course of investigation into the presence of drugs").  In Rodriguez, the Supreme Court rejected the line of cases in several circuits allowing for the de minimis extension of traffic stops, emphasizing that as soon as a stop is prolonged beyond the "amount of 'time reasonably required to complete [the stop's] mission," that stop is "unlawful."   135 S. Ct. at 1616 (quoting United States v. Caballes, 543 U.S. 405, 407 (2005)).

12

After <u>Rodriguez</u>, officers may still carry out certain unrelated conduct during a traffic stop, but may not measurably prolong the stop by doing so "absent the reasonable suspicion ordinarily demanded to justify detaining an individual." 135 S. Ct. at 1615. Specifically, an open-air dog sniff during a traffic stop does not violate a driver's Fourth Amendment rights unless it prolongs the stop beyond the period reasonably necessary to attend to the normal incidents of the stop. <u>See</u> <u>Rodriguez</u> at 1614-15.

Once a trained narcotics-detection dog has alerted on a vehicle, this may provide probable cause to conduct a search and expand the scope of a traffic stop. Probable cause exists if the dog's alert suggests a "fair probability" that contraband or evidence of a crime is present. <u>See</u> <u>Florida v. Harris</u>, 133 S. Ct. 1050, 1055 (2013). In <u>Harris</u>, the Supreme Court ruled that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." 133 S. Ct. at 1057. The court must analyze the totality of the circumstances — including the dog's certifications, training, and performance record — in evaluating whether its alert was sufficiently reliable to support probable cause. <u>Id.</u>

13

Determining whether a Fourth Amendment violation has occurred is only the first step in deciding whether evidence should be excluded.  The exclusionary rule is a "prudential" doctrine, and its "sole purpose . . . is to deter future Fourth Amendment violations."  <u>Davis v. United States</u>, 131 S. Ct. 2419, 2426 (2011) (citations omitted).  In addition to deterrence, courts consider the culpability, if any, of the police officers involved when applying the rule.  The Supreme Court has repeatedly held that "when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful," exclusion is unwarranted.  <u>Davis</u>, 131 S. Ct. at 2428 (quoting <u>United States v. Leon</u>, 468 U.S. 897, 909 (1984)).  This good-faith exception applies to a range of circumstances, including where "police conduct a search in objectively reasonable reliance on binding judicial precedent."  <u>Id.</u>; <u>see also</u> <u>United States v. Wilks</u>, 647 F.3d 520, 522-24 (4th Cir. 2011) (explaining the "good faith" exception and declining to exclude evidence where police reasonably relied on circuit precedent later overruled by the Supreme Court).

Police may question a person in custody only after advising him or her of the constitutional rights laid out in <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).  A waiver of <u>Miranda</u> rights must be knowing, voluntary, and intelligent in order for

14

a statement made in custody to be admissible.  See United States
v. Cristobal, 293 F.3d 134 (4th Cir. 2002).  A waiver is knowing
if it is made with "full awareness of both the nature of the
right being abandoned and the consequences of the decision to
abandon it."  Moran v. Burbine, 475 U.S. 412, 421 (1986).


### III. Discussion

The defendant does not challenge the initial traffic
stop of his vehicle.  He argues that the officers, during the
course of the stop, decided to conduct an unrelated criminal
investigation which prolonged the stop and resulted in an
unreasonable seizure in violation of his Fourth Amendment
rights.  Based on its findings of fact, the court agrees that
the stop was unduly prolonged in order to allow time for the
canine and its handler to reach the scene.  Prior to the point
that the dog alerted, at 3:37 a.m., there was merely a hunch,
but neither probable cause nor reasonable articulable suspicion,
that criminal conduct was afoot.  The lapse of 33 minutes from
3:04 a.m. to 3:37 a.m. for the stop in this case constituted a
plainly unjustifiable seizure for that length of time under the
Fourth Amendment.

As noted above, when Deputy Williams returned to his
cruiser with Montgomery's driver's license and the Grand Prix

title at or shortly after 3:11 a.m., he had everything he needed to begin writing the traffic citations.  However, Williams did not begin writing the citations until 3:21 a.m., and had not completed them when Dul alerted on the vehicle following the open-air sniff at 3:37 a.m.  While Deputy Williams spent some time awaiting confirmation from dispatch of the license's validity and the results of the warrant search, that does not excuse his failure to even begin writing the citations until ten minutes after he could have done so.  The stop here was unduly prolonged far beyond the time reasonably required to complete the stop's mission.

This extensive delay is also far more than could be justified by the de minimis exception, even if it were found that the officers acted in good faith and the court took into account the state of the law in the Fourth Circuit prior to the Supreme Court's holding in Rodriguez.  While the de minimis exception was clearly established by binding Fourth Circuit precedent at the time of the stop, its application would only obtain for the few minutes Deputy Williams took to speak with Montgomery outside of the car regarding his travel plans and the request to search the vehicle.  The additional ten minutes or more by which the officer delayed writing the necessary citations was not a de minimis extension by any means.

16

Though having concluded that the traffic stop was unnecessarily prolonged in violation of the defendant's Fourth Amendment rights, the court nevertheless considers whether the open-air sniff conducted by Lieutenant Roberts and Dul was sufficiently reliable to support probable cause to search the Grand Prix.  The fact of training and certification by an accrediting agency gives rise to a rebuttable presumption that a narcotics dog is reliable.  See Harris, 133 S. Ct. at 1057.  The defendant has not presented any evidence challenging the adequacy of Dul's training and certification regimen.  However, he questions Dul's reliability based on a review of the dog's performance record, both in training sessions and in the field.  The defendant argues that Dul's training and field performance records suggest a failure rate of up to 25%.  The evidence offered on this phase of the motion is generally undisputed.

In evaluating the totality of the circumstances surrounding the use of Dul's alert to provide probable cause to search the vehicle, the court gives little weight to the field performance issues raised by the defendant.  The Supreme Court has held that in assessing a narcotics dog's reliability, field performance records "in most cases . . . have relatively limited import."  Harris, 133 S. Ct. at 1056.  This is the case because officers are unable to confirm false negatives in the field (as

17

no search is conducted), may fail to find drugs where a dog correctly alerts, and may not realize a dog has alerted based on a residual odor of drugs no longer present.  Id. at 1056-57; see also United States v. Green, 740 F.3d 275, 283 n. 3 (4th Cir. 2014) (noting that false positives due to residual odors should not count against a dog's success rate).  Consistent with that observation, Lieutenant Roberts testified that several of the field records which the defendant believes reflect Dul's errors may be explained by other factors, such as the presence of residue from narcotics.  Accordingly, Dul's failure rate in the field is likely lower than 25%.

Notwithstanding the dispute regarding Dul's failure rate, the court is satisfied that in conjunction with his training and certification, his performance record amply supports the officers' reliance on his alert to support probable cause to conduct a search.  Dul's performance record is superior to that of dogs which have been found to be reliable by other courts.  See Green, 740 F.3d at 283-284 (affirming district court's finding that dog with 43% success rate was reliable); United States v. Bentley, 795 F.3d 630, 636 (7th Cir. 2015) (accepting field detection rate of 59.5%); United States v. Holleman, 743 F.3d 1152, 1157 (8th Cir.) (57%).

While Dul's performance in a controlled training environment is more relevant to his reliability than his field performance, the court also concludes that his training record suggests sufficient reliability to support probable cause. Out of the approximately fifty training records produced by Lieutenant Roberts, the defendant raised issues with Dul's performance in twelve instances. In several of these twelve cases, Roberts was able to explain why Dul may have had difficulty detecting drugs. For example, some trainings involved drugs hidden at different elevations, or drugs that Dul had not been trained to detect before. It is apparent that in a training environment, some trial and error is required to hone the skills necessary for a narcotics dog to reliably detect narcotics in the field.

Based on the testimony from Lieutenant Roberts, Dul's training and certification, and his performance in the field, the totality of the circumstances establishes that Dul's alert suggested the "fair probability" that narcotics were present in the Grand Prix. As such, the court concludes that the alert on the vehicle would have supported probable cause to conduct a search.

Finally, the court finds that there was no defect in the defendant's knowing and voluntary waiver of his <u>Miranda</u>

rights, made prior to his interview with Detective Mellinger. Taken in context, Mellinger's statement that initialing the individual rights listed on the form "doesn't mean anything" — other than that he read and understood them — does not suggest that the defendant was misled.  After making that statement, Mellinger specifically instructed the defendant to read the waiver paragraph explaining the consequences of waiving those rights, and the defendant confirmed that he understood the waiver both verbally and by signing his name.

### IV.   Conclusion

For the reasons discussed above, the court concludes that the use of Dul, the narcotics dog, to support probable cause for a search did not alone provide a basis to suppress evidence against the defendant.  Neither did the manner in which police obtained a waiver of defendant's Miranda rights. However, because the lengthy and unjustified extension of the traffic stop violated the defendant's Fourth Amendment right to be free from unreasonable seizure by the government, the court grants his motion to exclude any evidence found as a result of that seizure as well as the mirandized statement given by the defendant as a further result of that unlawful seizure.

The court, accordingly, ORDERS that the defendant's motion to suppress be, and hereby is, granted.

The Clerk is directed to transmit copies of this written opinion and order to the defendant and counsel of record.

ENTER:     February 5, 2016

John T. Copenhaver, Jr.
United States District Judge